IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

| | | |
|---|---|---|
| Trac Lease, Inc., | * | Civil Action No. 2:12-cv-28 |
| Plaintiff, | * | |
| v. | * | IN ADMIRALTY |
| Each Marine Chassis and Any Related Equipment, Located at the Facilities Owned, Operated or Controlled by Mid-Atlantic Leasing Corporation, | * * | |
| Defendants *in rem*, and | * | |
| Mid-Atlantic Leasing Corporation, | * | |
| Defendant *in personam*. | * | |

\* \* \* \* \* \* \* \* \* \* \* \*

**TRAC'S MEMORANDUM OPPOSING MALC'S MOTIONS TO VACATE
AND SUPPORTING TRAC'S MARITIME JURISDICTION-BASED CLAIMS**

This Court now should deny MALC's motions.[1] This memorandum, and Trac's accompanying Verified First Amended Complaint, and the further supporting affidavit of Michael Schaffer, Vice President of Pool Operations and Fleet Management of Trac ("Schaffer Aff.") herewith confirms the following:

1. The Trac-MALC Depot Agency Agreement ("Agreement") is a maritime contract and this Court pursuant to 28 U.S.C. § 1333 has admiralty jurisdiction over the dispute concerning the Agreement;

---

[1] Trac with this memorandum opposes all of MALC's motions. MALC's supporting memoranda (which MALC claims to be pursuant to Supplemental Admiralty Rule E(4)(f) to vacate, and Fed. R. Civ. P. 12(b)(1) challenging this Court's Admiralty jurisdiction) are materially identical. The memorandum directed to this Court's Substitute Custodian appointment refers only to the motion to vacate memorandum.

2. The Marine Chassis are Trac's maritime property;

3. This Court properly issued and the United States Marshal properly served the Supplemental Admiralty Rule D warrant of arrest for the Marine Chassis. This Court therefore also should maintain the warrant and Substitute Custodian for this marine property arrested pursuant to Supplemental Rule D.

As a threshold matter, however, this Court should also, pursuant to Supplemental Rule E(4)(f), dismiss MALC's "motion to vacate." MALC fails to satisfy the fundamental Rule E(4)(f) requirement of "claim[ ] an[ ] interest" in Trac's marine chassis. MALC therefore has no standing pursuant under Supplemental Rule E(4)(f) to challenge this Court's issue of the Supplemental Rule D arrest warrant.

### MALC Has No Standing to Bring Its Supplemental Rule E(4)(f) Motion

Supplemental Admiralty Rule E(4)(f) states as follows:

> **(f) Procedure for Release From Arrest or Attachment.** Whenever property is arrested or attached, any person **claiming an interest in it** shall be entitled to a prompt hearing at which the plaintiff shall all be required to show why the arrest or attachment should not be vacated or other relief granted consistent with these rules.

(Emphasis added).[2]

---

[2] Supplemental Rule C(6)(a) contains the requirements for claiming a right or interest in the property:

**Statement of Interest; Answer.** In an action *in rem*:

(i) A person who asserts a right of possession or any ownership interest in the property that is the subject of the action **must file a verified statement of right or interest**:

A. Within 14 days after the execution of process, or

B. Within the time that the court allows;

MALC not only has failed to meet this threshold requirement, but is unable to do so. MALC nowhere in its filings "claims an interest" in Trac's Marine Chassis. MALC agrees that the Marine Chassis belong to Trac. MALC agrees that there is a contract dispute (which it throws off as "garden variety," which in fact is MALC's brazenly and wrongfully holding Trac's maritime property, holding up Trac to pay MALC far more that MALC ever lawfully could be owed). MALC must admit (because it insists that the Agreement controls) that the Paragraph 7 ("No Liens") of the Agreement expressly states as follows:

> Depot [MALC] acknowledges that all Trac Lease Equipment which comes into its possession pursuant to this Agreement is the property of Trac Lease and will, notwithstanding any other provision in this Agreement, be delivered solely to Trac Lease upon demand. **Depot agrees that it will not assert any lien or make any claim on the Equipment, and no lien will attach against Trac Lease or its Equipment, for failure of Trac Lease, any Lessee or any other third party to pay Depot for charges due Depot from Trac Lease, or such Lessee or third party**.

(Emphasis added). The Agreement consequently prevents and estops MALC from making any "claim" (of any "interest") in any of Trac's Marine Chassis. MALC has no such interest and claims none here.

Because of MALC's lack of claim in Trac's Marine Chassis, MALC fails Supplemental Rule E(4)(f)'s threshold requirement, and this Court now as a preliminary matter should deny MALC's motions to vacate, just as the United States District Court, Eastern District of Louisiana

---

        (ii)      The statement of right or interest must describe the interest in the property that supports the person's demand for its restitution or its right to defend the action;

        (iii)     An agent, bailee, or attorney must state the authority to file a statement of right or interest on behalf of another ….

(Emphasis Added).

did in *Probulk Carriers, Ltd v. Daewoo Logistics Corp.*, 2009 U.S. Dist. LEXIS 24552, *4 (E.D. La. Mar. 13, 2009):

> Rule E(4)(f) gives to "any person claiming an interest" in the attached property the ability to vacate an attachment. Daewoo Logistics argues that it has no interest in the vessel. Daewoo Logistics is not a party entitled to vacate the attachment as it is not a party claiming an interest in the vessel.

### **The Agreement is a Maritime Contract**

Even if this Court were somehow to find that MALC could move to vacate under Supplemental Rule E(4)(f) without "claiming an interest" as Supplemental Rule E(4)(f) requires, Trac – as confirmed by the First Amended Verified Complaint, as well as the original Verified Complaint – meets the Supplemental Rule E(4)(f)'s requirement that Trac make only a *prima facie* showing that admiralty subject matter jurisdiction exists. *See Societe de Conditionnement en Aluminium v. Hunter Eng'g Co.*, 655 F.2d 938, 942 (9th Cir. 1981).

In *Newport News Shipbuilding & Dry Dock Co. v. S.S. Independence*, 872 F. Supp. 262, 265 (E.D. Va. 1994) (Doumar, J.) (denying motion to vacate a Supplemental Rule C vessel arrest on an *in rem* maritime lien), Judge Doumar wrote as follows concerning this stage of a maritime arrest proceeding:[2]

---

[2] Many of MALC's case citations muddle and conflate the distinction between a Supplemental Rule C arrest on a maritime lien claim against a vessel *in rem*, and a Supplemental Rule D possessory action arrest. The latter does not turn on a maritime lien; it turns on the plaintiff's possessory right to maritime property.

Where courts have vacated claims by marine chassis (or ocean container) lessors to maritime liens, it is not because the agreements involved were non-maritime, or even that the marine chassis or ocean containers were not "necessaries" to the vessel's operation. It was, instead, because the courts found that neither the marine chassis nor ocean containers had been provided (under the federal Commercial Instruments and Maritime Lien Act, 46 U.S.C. § 34101 *et seq*. or its predecessor Federal Maritime Lien Act) directly to the vessels. MALC's Supplemental Rule C cases related to chassis or containers, or to maritime liens *in rem* generally, are inapposite for this reason.

-4-

> Plaintiff argues that the plaintiff need only show "probable cause" to arrest. *See Amstar Corp. v. S/S Alexandros T.*, 1981 AMC 2697, 2708, 664 F.2d 904, 912 (4th Cir. 1981). In *Mujahid v. M/V Hector*, 1991 U.S. App. LEXIS 28445, *4 (4th Cir. 1991) (unpublished opinion), the Fourth Circuit adopted the reasoning of the Third Circuit in *Salazar v. Atlantic Sun*, 1989 AMC 2594, 2603, 881 F.2d 73, 79 (3d Cir. 1989), explaining that at a post-arrest hearing, the plaintiff need only show reasonable grounds for obtaining an arrest warrant for a vessel. The reasonable grounds/probable cause standard translates roughly to requiring that plaintiff show entitlement to a maritime lien. *Amstar Corp.*, 1981 AMC at 2708, 664 F.2d at 912.
>
> This Court agrees that plaintiff need show only probable cause for arrest of a vessel, and will evaluate the arrest of the S.S. Independence under that standard. To carry its burden, then, plaintiff must establish that it was entitled to a maritime lien, and that therefore it had reasonable grounds or probable cause to arrest the S.S. Independence.

Trac proceeds pursuant to Supplemental Rule D ("Possessory, Petitory, and Partition Actions"), which provides in pertinent part as follows:

> In all actions for possession, partition, and to try title maintainable according to the course of the admiralty practice with respect to a vessel, in all actions so maintainable with respect to the possession of cargo or other maritime property . . . . , the process shall be by a warrant of arrest of the vessel, cargo, or other property.

Here, Trac satisfies the *prima facie* requirement of probable cause under Supplemental Rule D, because the Agreement is a maritime contract;[3] that is, Trac's is an action "according to the course of the admiralty practice," which includes, an action to enforce, and arising out of, a

---

[3] Trac's First Amended Verified Complaint omits reference to maritime tort-based admiralty jurisdiction. Consequently the only focus here is confirming this Court's admiralty jurisdiction case arising out of MALC's breach of its maritime contract with Trac.

MALC's discussion of *Flexi-Van Leasing v. Avondale Container Yard*, 2000 U.S. Dist. LEXIS 13480 (E.D. La.) is therefore inapposite here. In *Flexi-Van Leasing*, there was no contract between plaintiff and the container yard, for chassis storage or otherwise. Instead, plaintiff alleged that the container yard (which had no relationship otherwise with plaintiff) had stolen plaintiff's chassis. The only jurisdiction issue at stake, then, was whether there was somehow admiralty tort jurisdiction. Because the tort did not occur on the water, the court held that there was no maritime tort jurisdiction, *citing Executive Jet Aviation, Inc. v. City of Cleveland*, 409 U.S. 249, 270–71 (1972), which is solely about maritime tort jurisdiction.

maritime contract. Because the Marine Chassis arrested here pursuant to Supplemental Rule D are "maritime property," Trac must simply make a *prima facie* claim:

> Thus, because this is a possessory action, to demonstrate that the arrest should not be vacated, Plaintiff must establish a *prima facie* claim that his "property … has been wrongfully taken." *Privilege Yachting Inc., v. Teed*, 849 F. Supp. 298, 301 (D. Del. 1994) (*citing Cary Marine Inc., v. Motorvessel Papillion*, 872 F.2d 751, 756 (6th Cir. 1989)); *Hunt v. A Cargo of Petroleum Products Laden on Steam Tanker Hilda*, 378 F. Supp. 701, 703 (E.D. Pa. 1974).

*George v. A 2005 Donzi Motor Yacht*, 2009 U.S. Dist. LEXIS 102186, *3–4 (S.D. Fla. Oct. 22, 2009) (denying motion to vacate a Supplemental Rule D arrest). MALC agrees that the Marine Chassis are Trac's, and Trac states a *prima facie* claim that MALC wrongfully has taken them.

Trac's Verified Complaint and First Amended Verified Complaint both confirm that the sole purpose of the Agreement was that MALC, as Trac's depot, is to have Trac's Marine Chassis available to Trac's lessees for the transportation of ocean containers, carrying (or preparing to carry) ocean cargo. Trac's Marine Chassis (as defined in Trac's Complaints, including the parts necessary to maintain those Marine Chassis) are marine industry standard (20' and 40' long), and are used to carry 20' and 40' ocean containers. Trac's Marine Chassis have no purpose other than to transport ocean containers and to receive or discharge ocean cargo. Trac's contract with MALC has no purpose other than to allow Trac to fulfill its Marine Chassis leases with Trac's steamship line and ocean common carrier lessees. The Agreement is in its very core a maritime contract. The Marine Chassis have no purpose other than a maritime purpose; the Agreement has no purpose other than maritime commerce. If there was no maritime commerce, no ocean vessels or ocean shipping, and no ocean containers for that shipping, there would be no Agreement between Trac and MALC and no Marine Chassis.

The only reason that the Marine Chassis have stayed at MALC for some time is the significantly decreased demand for Marine Chassis at the Port of Virginia.[4] The Marine Chassis remain at MALC awaiting an increase in steamship lines' and ocean common carrier lessees' demands for the Marine Chassis. Trac has never intended (nor does MALC argue otherwise) to remove the Marine Chassis from maritime use; it has continued to keep them available for maritime use. Again, Trac's Marine Chassis are not for any other than a maritime use.

In *South Carolina State Ports Auth. v. Silver Anchor, S.A., (Panama)*, 23 F.3d 842, 845–46 (4th Cir. 1994), the United States Court of Appeals for the Fourth Circuit wrote as follows:

> Congress has granted federal district courts original jurisdiction over "any civil case of admiralty or maritime jurisdiction." 28 U.S.C. § 1333(1). When confronted with issues of admiralty jurisdiction over contracts, courts "look to the subject matter of the . . . contract and determine whether the services performed under the contract are maritime in nature." *Exxon Corp. v. Central Gulf Lines, Inc.*, 500 U.S. 603, 111 S. Ct. 2071, 2077, 114 L. Ed. 2d 649 (1991) (citing *Kossick v. United Fruit Co.*, 365 U.S. 731, 735-38, 6 L. Ed. 2d 56, 81 S. Ct. 886 (1961)). As Justice Harlan explained in *Kossick*, "the boundaries of admiralty jurisdiction over contracts -- as opposed to torts or crimes -- being conceptual rather than spatial, have always been difficult to draw. Precedent and usage are helpful insofar as they exclude or include certain common types of contract …." 365 U.S. at 735. Very little in the way of general principles can be extrapolated from the case law. Perhaps Professor Black put it best when he wrote that "there is about as much 'principle' [in admiralty contract jurisdiction] as there is in a list of irregular verbs." Charles L. Black, Jr., *Admiralty Jurisdiction: Critique and Suggestions*, 50 Colum. L. Rev. 259, 264 (1950), *quoted in Sisson v. Ruby*, 497 U.S. 358, 372 n.4, 111 L. Ed. 2d 292, 110 S. Ct. 2892 (1990) (Scalia, J., concurring in the judgment).

---

[4] MALC may argue that some chassis and some containers (besides Trac's Maritime Chassis here) have other than a marine use – namely, in connection with containers used for land-based storage. That is not Trac's business, confirmed by the fact that with the decline of marine business, imports and exports in the Port of Virginia, the Marine Chassis have stood by at MALC's depot for a resumption of that business. They have not "filled the gap" on one-off or other similar leases or sales for domestic uses. This used container and chassis business does not and has not – at least with Trac's permission – involve Trac's Marine Chassis here or the Agreement.

"Admiralty jurisdiction has, in the past, changed as 'new conditions give rise to new conceptions of maritime concerns.'" *Alabama Dry Dock & Shipbuilding Co. v. Kininess*, 554 F.2d 176, 179 (5th Cir.), *cert. denied*, 434 U.S. 903 (1977), *citing Detroit Trust Co. v. The Thomas Barlum*, 293 U.S. 21 (1934).

In *Norfolk Southern v. James N Kirby Pty. Ltd.*, 543 U.S. 14, 26–27 (2004) (O'Connor, J.) (considering multimodal bills of lading, where much of the transportation was overland),[5] The Supreme Court wrote concerning maritime contracts, and federal admiralty jurisdiction over them, as follows:

> We have reiterated that the "'fundamental interest giving rise to maritime jurisdiction is "the protection of maritime *commerce*."'" *Exxon, supra*, at 608, 114 L. Ed. 2d 649, 111 S. Ct. 2071 (emphasis added) (quoting *Sisson v. Ruby*, 497 U.S. 358, 367, 111 L. Ed. 2d 292, 110 S. Ct. 2892 (1990), in turn quoting *Foremost Ins. Co. v. Richardson*, 457 U.S. 668, 674, 73 L. Ed. 2d 300, 102 S. Ct. 2654 (1982)). The conceptual approach vindicates that interest by focusing our inquiry on whether the principal objective of a contract is maritime commerce. While it may once have seemed natural to think that only contracts embodying commercial obligations between the "tackles" (*i.e.*, from port to port) have maritime objectives, **the shore is now an artificial place to draw a line**. Maritime commerce has evolved along with the nature of transportation and is often inseparable from some land-based obligations. **The international transportation industry "clearly has moved into a new era--the age of multimodalism, door-to-door transport based on efficient use of all available modes of transportation by air, water, and land."** 1 Schoenbaum 589 (4th ed. 2004). The cause is technological change: Because goods can now be packaged in standardized containers, cargo can move easily from one mode of transport to another. *Ibid.* See also *NLRB v. Longshoremen*, 447 U.S. 490, 494, 65 L. Ed. 2d 289, 100 S. Ct. 2305 (1980) ("'[C]ontainerization may be said to constitute the single most important innovation in ocean transport since the steamship displaced the schooner'"); G. Muller, Intermodal Freight Transportation 15–24 (3d ed. 1995).

\* \* \*

---

[5] It is important to note that most all of the opinions which MALC cites predate the Supreme Court's 2004 *Norfolk Southern* decision. After *Norfolk Southern*, the "wholly maritime" requirement no longer applies to determine federal admiralty jurisdiction.

> Some lower federal courts appear to have taken a spatial approach when deciding whether intermodal transportation contracts for intercontinental shipping are maritime in nature. They have held that admiralty jurisdiction does not extend to contracts which require maritime and nonmaritime transportation, unless the nonmaritime transportation is merely incidental--and that long-distance land travel is not incidental. *See, e.g.*, *Hartford Fire Ins. Co. v. Orient Overseas Containers Lines (UK) Ltd.*, 230 F.3d 549, 555–556 (CA2 2000) ("Transport by land under a bill of lading is not 'incidental' to transport by sea if the land segment involves great and substantial distances," and land transport of over 850 miles across four countries is more than incidental); *Sea-Land Serv., Inc. v. Danzig*, 211 F.3d 1373, 1378 (CA Fed. 2000) (holding that intermodal transport contracts were not maritime contracts because they called for "substantial transportation between inland locations and ports both in this country and the Middle East" that was not incidental to the transportation by sea); *Kuehne & Nagel (AG & Co.) v. Geosource, Inc.*, 874 F.2d 283, 290 (CA5 1989) (holding that a through bill of lading calling for land transportation up to 1,000 miles was not a traditional maritime contract because such "extensive land-based operations cannot be viewed as merely incidental to the maritime operations"). **As a preliminary matter, it seems to us imprecise to describe the land carriage required by an intermodal transportation contract as "incidental";** realistically, each leg of the journey is essential to accomplishing the contract's purpose. In this case, for example, the bills of lading required delivery to Huntsville; the Savannah port would not do.
>
> **Furthermore, to the extent that these lower court decisions fashion a rule for identifying maritime contracts that depends solely on geography, they are inconsistent with the conceptual approach our precedent requires**. See *Kossick, supra*, at 735, 6 L. Ed. 2d 56, 81 S. Ct. 886.

(Emphasis added); *accord, BDL Int'l v. Sodetal USA, Inc.*, 377 F. Supp. 2d 518, 522–23 (D.S.C. 2005) (contract for overland carriage of ocean cargo was a maritime contract).

> The inquiry "is whether the transaction relates to ships and vessels, masters and mariners, as the agents of commerce." *Kossick v. United Fruit Co., supra*, 365 U.S. at 736, 81 S. Ct. at 890, Quoting, 1 Benedict, Admiralty, 131, as currently set forth in 1 Benedict on Admiralty § 183 (7th ed. 1977). Moreover, under this standard, the place of performance is not controlling since contracts which relate to ships in their use as ships or to commerce or transportation in navigable waters are clearly maritime contracts regardless of whether the contract is to be performed on land or sea. *Pierside Terminal Operators, Inc. v. M/V Floridian*, 423 F. Supp. 962, 967 (E.D. Va. 1976). The controlling factor, referred to by the Court in Pierside as a "qualitative prerequisite" to admiralty contract jurisdiction, is whether the contract has a "maritime flavor." *Id*. at 970. The Court delineated "maritime flavor" as: "Performance of an actual "maritime service' is required for jurisdictional "maritime flavor'." *Id*. at 968.

*Ford Motor Co. v. Wallenius Lines, M/V Atlantic Cinderella*, 476 F. Supp. 1362, 1365 (E.D. Va. 1979).[6]

Consequently, the fact that Trac has agreed to stage its Marine Chassis with MALC on land, within easy transportation distance to and from the Port of Virginia and convenient and available to Trac's steamship line and ocean common carrier lessees, has nothing to do with the fact that the Agreement is a maritime contract. To put it another way, steamed crabs eaten in Blacksburg (as opposed to Charlottesville or Norfolk) are no less seafood – they still have a "maritime flavor."[7]

---

[6] *Accord*, *MP Leasing Corp. v. Colonna's Shipyard*, 2009 U.S. Dist. LEXIS 76000, *8–9, 2009 A.M.C. 1462 (E.D. Va. 2009) (Jackson, J.):

> Generally, admiralty law applies to all maritime contracts. A contract is maritime if it relates "to a ship in its use as such, or to commerce or to navigation on navigable waters, or to transportation by sea or to maritime employment." *Todd Marine Enterprises, Inc. v. Carter Machinery Co., Inc*., 898 F. Supp. 341, 343 (E.D. Va. 1995) (*quoting J.A.R., Inc. v. M/VLady Lucille*, 963 F.2d 96,98 (5th Cir. 1992)). Contracts to repair or perform extensive reconstruction of a ship fall within admiralty jurisdiction. *Id.* (*citing New Bedford Dry Dock Co. v. Purdy*, 258 U.S. 96, 99, 42 S. Ct. 243, 66 L. Ed. 482 (1922)). The essence of the contract at issue was to perform maintenance and repair services on the Vessel. This Court finds that the contract at issue was a maritime contract and therefore admiralty law governs.

[7] This Court can also take judicial notice that at the Port of Virginia – and for that matter all ocean ports – cargo, including ocean containers and the marine chassis transporting them, are staged, stored and used to load and unload to and from vessels, on land. This does not, as the caselaw confirms, make the contracts concerning them any less "maritime."

MALC's suggestion that the Agreement is non-maritime because it (and Trac) repairs, stores, and makes Trac's Marine Chassis available on land is nonsensical alongside the real world of not only maritime commerce, but buoyancy. Most (if not all) marine chassis, ocean containers and even cargo placed on water tend to sink. That makes repairing them on water, for example, difficult. As the caselaw makes plain, maritime contracts concern maritime property other than vessels, and they also concern land-based storage and repair of maritime property.

Consequently, for example, even contracts to store and repair vessels (which normally float) on land, are maritime contracts. "We conclude, therefore, that the boats were not withdrawn from navigation and that the contracts for their dry storage were within admiralty jurisdiction." *American Eastern Development Co. v. Everglades Marina*, 608 F.2d 123, 125 (5th Cir. 1979)(overruling objection, that land-based storage contract for boats was not a maritime contract); *Commercial Union Ins. Co. v. Used Boat Haven*, 1996 U.S. Dist. LEXIS 5181, No. 94-0448, 1996 WL 191960, at *2 (S.D.N.Y. Apr. 22, 1996) ("It has long been held that contracts to repair and store vessels fall within the Court's admiralty jurisdiction, whether the vessels are kept on land or in the water.") (*citing Royal Ins. Co. of Am. v. Long Beach Marine Land*, 1989 A.M.C. 2090 (S.D.N.Y. Apr. 30, 1987).

> While a claim for breach of such a storage contract would in and of itself appear to bring admiralty jurisdiction into being, *Fireman's Fund American Insurance Co. v. Boston Harbor Marina, Inc., supra*, 1968 AMC at 970–71, 285 F. Supp. at 39, the contract in this case allegedly required defendant to prepare the sailboat for winter storage which is sufficiently akin to a repair and servicing contract to treat it in the same way as the latter type of contract is treated for purposes of admiralty jurisdiction. See the "repair" contract in question in *Leyendecker* (at 1544) and the "winter storage" and "repair and servicing during winter storage" contract in question in Fireman's Fund case (1968 AMC at 770–773, 285 F. Supp. at 39, 40). *See also* the stress by Mr. Justice Pitney in *North Pacific Steamship Co. v. Hall Brothers Marine Railway & Shipbuilding Co.*, 249 U.S. 119, 128, 129 (1919) upon the "nature" and "character" of the services contracted for as determinative of whether admiralty jurisdiction is or is not present.

*Schuster v. Baltimore Boat Sales*, 1980 AMC 789 (D. Md. 1979).

> As the court in *Commercial Union Ins. Co. v. Used Boat Haven*, 1996 U.S. Dist. LEXIS 5181, at *1 (S.D.N.Y. 1996) stated,
>
>> contracts to repair and store vessels fall within the Court's admiralty jurisdiction, whether the vessels are kept on land or in the water. The key to jurisdiction is not the location of the vessel, but whether the contract sought to be enforced impacts maritime commerce. Maritime jurisdiction exists over a dispute relating to coverage of insurance policy to vessel [sic] stolen from driveway because whether theft of a vessel occurs while it is afloat or ashore, the impact of the theft is on maritime commerce.

1996 U.S. Dist. LEXIS 5181 at *6 (citations omitted); *see also Sirius Ins. Co. (UK) v. Collins*, 16 F.3d 34, 36–37 (2d Cir. 1994) (finding maritime jurisdiction over dispute relating to coverage of insurance policy to vessel stolen while on land because the theft impacted maritime commerce).

*AXA Re Property & Ins. Co. v. Tailwalker Marine*, 2004 U.S. Dist. LEXIS 27920, at *7, 2005 AMC 749 (D.S.C. Dec. 17, 2004). Trac has not withdrawn its Marine Chassis at MALC from maritime commerce, expressly keeping them available and ready at MALC for resumption of an increased level of maritime commerce in and out of the Port of Virginia.

Further, MALC's activity of repairing Trac's Maritime Chassis is an essentially maritime activity.

> The Board thus evidently determined that, overall, Coleman's maritime activities were essential to loading and unloading.
>
> We find this conclusion to be legally and factually correct.[4] The *Schwalb* case makes clear that maritime status may be based upon land based activity only if it is "an integral or essential part of loading or unloading a vessel." 110 S. Ct. at 384. Maintenance of the chassis in good working order is essential to prevent the loading and unloading process from breaking down. They must be kept in good condition to support the containers attached to them at dockside. They must be maintained in order to be hauled by hustlers as well as tractor trucks. Similarly, hustlers and containers, both of which Coleman worked on periodically, are essential to the loading and unloading process.
>
> FOOTNOTES
>
> [4] Given our conclusion that all of Coleman's employment activities were essentially maritime ….

*Atlantic Container Service v. Coleman*, 904 F.2d 611, 617–18 (11th Cir. 1990).

> Suffice it to say, the Court adheres to its decision on this issue based upon the facts of the case and the holding in *Northeast Marine Terminal Co. v. Caputo*, 432 U.S. 249, 1977 AMC 1037 (1976). There it was held that a container was an extension of a vessel's hold and part of modern-day methods of loading and discharging cargo. The container involved here was part of Farrell's ocean freight-carrying operations. Marine Repair's contract with Farrell to repair and inspect Farrell's containers on Pier 11 (the site of the accident to Palladino and Caiafa) was a maritime contract because it dealt with an instrumentality that was

part of and went into the flow of maritime commerce. See *Integrated Container Service, Inc. v. Starlines Container Shipping Limited*, 1980 AMC 736, 742–43, 476 F.Supp. 119, 125 (SDNY 1979); *Foss Launch and Tug Co. v. Char Ching Shipping U.S.A., Limited*, 1987 AMC 913, 916, 808 F.2d 697, 699 (9 Cir.), cert. denied, 484 U.S.  , 1988 AMC 2399; *CTI-Container Leasing Corp. v. Oceanic Operations Corp.*, 1982 AMC 2541, 2544–45, 682 F.2d 377, 380 (2 Cir. 1982).

*Palladino v. AP Moller*, 1989 AMC 513 (N.Y. Sup. Ct. 1988).

Further confirming Trac's *prima facie* Supplemental Rule D case, Trac's Marine Chassis are maritime property, as the United States Court of Appeals for the Eleventh Circuit confirmed:

> We conclude, however, that the district court did err in granting Defendants' Motions to Vacate the Supplemental Rule D Warrant of Arrest in Rem of certain shipping containers and chassis because we find that they were maritime property.
>
> \* \* \*
>
> Third, we conclude that the district court did err in holding that the shipping containers and chassis were not maritime property under Supplemental Admiralty Rule D. Supplemental Admiralty Rule D specifically allows for the warrant of arrest of "other property." It provides:
>
>> In all actions for possession, partition, and to try title maintainable according to the course of the admiralty practice with respect to a vessel, in all actions so maintainable with respect to the possession of cargo or other maritime property, … the process shall be by a warrant of arrest of the vessel, cargo, or other property, and by notice in the manner provided by Rule B(2) to the adverse party or parties.
>
> Fed.R.Civ.P. Supplemental Rule D. *See also CTI-Container Leasing Corp. v. Oceanic Operations Corp.*, 682 F.2d 377, 380–81 (2d Cir. 1982) (holding that "a lease [contract] of cargo containers for use on a ship is a maritime contract.") It is also abundantly clear that the parties intended the shipping containers and chassis to be maritime property. Because the shipping containers and chassis were maritime property under Supplemental Admiralty Rule D, the district court erred in vacating the Warrants of Arrest *in Rem*.

*Unitas Finance v. Di Gregorio Navegacao*, 2000 U.S. App. LEXIS 38776, \*3, 6–7 (11th Cir. April 10, 2000) (allowing Supplemental Rule D arrest of "containers and chassis" where a maritime contract was alleged to have been breached).

Trac also has asserted its rights to Marine Chassis. MALC does not contest that the Marine Chassis are Trac's. Trac therefore not only meets the *prima facie* case that Supplemental Rule E(4)(f) requires at this stage of the Supplemental Rule D case, but also has confirmed that this Court has admiralty jurisdiction here.[8] This Court should therefore deny MALC's motions.

### Trac's Pending Detinue and Specific Performance Claims

In the alternative to Trac's Supplemental Rule D claim, should this Court somehow find that the Agreement is not a maritime contract, Trac's First Amended Verified Complaint states claims both of detinue under Virginia law, and specific performance. Additionally, there is diversity jurisdiction here.

As the First Amended Verified Complaint sets out, MALC has apparently only asserted "liens" (or some sort of possessory right) worth no more than $480,000. MALC cannot hold over $4.7 **million** worth of Trac's Marine Chassis, under any reading of the Agreement, for an alleged claim worth no more than 10% of the value of Trac's property. Therefore, Trac's First Amended Verified Complaint asks this Court, in the alternative to the Supplemental Rule D claims, to issue a detinue writ for the $480,000 of Marine Chassis and order that MALC release the remainder (over which, even by wild imagination, it could never claim to hold, based on any "lien" or otherwise).

Consequently, even if this Court somehow were to set aside the Supplemental Rule D arrest warrant for Trac's Marine Chassis, Trac's First Amended Verified Complaint states alternative grounds to continue the arrest of those Marine Chassis (in detinue) and to return them to Trac (by specific performance).

---

[8] As the case progresses, this Court, Trac, or MALC may of course – pursuant to Fed. R. Civ. P 12(h) – with further discovery or evidence, may offer further argument or decision that this Court has or lacks subject matter admiralty jurisdiction here.

Such approach should not be necessary, however, because the Supplemental Rule D arrest warrant which this Court issued for Trac's Marine Chassis, is valid. The Agreement is a maritime contract, which MALC breached, and Trac's Marine Chassis are maritime property, which Trac owns.

Dated: January 23, 2011.

/s/ David N. Ventker
David N. Ventker (VSB No. 29983)
Marissa M. Henderson (VSB No. 44156)
Nathan G. Zaleski (VSB No. 48953)
Ventker & Warman, PLLC
101 West Main Street, Suite 810
Norfolk, VA 23510
Tel:   (757) 625-1192
Fax:   (757) 625-1475
Email: dventker@ventkerlaw.com
mhenderson@ventkerlaw.com
zaleski@ventkerlaw.com

Trac Lease, Inc. Counsel

OF COUNSEL:
J. Stephen Simms
John T. Ward
Simms Showers LLP
20 South Charles Street, Suite 702
Baltimore, Maryland 21201
Tel:   410-783-5795
Fax:   410-510-1789
Email: jssimms@simmsshowers.com
       jtward@simmsshowers.com

## CERTIFICATE OF SERVICE

I hereby certify that on this January 23, 2011 I caused the foregoing to be filed on the Court's CM/ECF system for service on all record counsel.

/s/ David N. Ventker
David N. Ventker (VSB No. 29983)
Marissa M. Henderson (VSB No. 44156)

Nathan G. Zaleski (VSB No. 48953)
Ventker & Warman, PLLC
101 West Main Street, Suite 810
Norfolk, VA 23510
Tel: (757) 625-1192
Fax: (757) 625-1475
Email: dventker@ventkerlaw.com
mhenderson@ventkerlaw.com
zaleski@ventkerlaw.com

Trac Lease, Inc. Counsel